# WESTERN UNION TEL. CO. v. C. P. STEVENSON.

### ERROR TO THE COURT OF COMMON PLEAS OF McKEAN COUNTY.

Argued May 9, 1889—Decided October 7, 1889.
[To be reported.]

1. The rule requiring the production of the best evidence of a fact to be proved, excludes only that evidence which itself indicates the existence of more original sources of information, and where there is no substitution of secondary for original evidence, the rule is not infringed.

Statement of Facts.

(*a*) A principal sent to his agents in distant cities telegraphic orders to make certain purchases and sales of oil on his account, at certain prices; he received from them by the same line telegraphic reports that his orders had been executed, and afterwards carried out the contracts of purchase and sale as so reported to him.

2. In such case, the principal had sufficient original knowledge of the transactions to make his testimony submissible to the jury in proof of the fact that such contracts were entered into and of the prices at which the oil was bought and sold, although his agents themselves were not called to testify.

3. A rule of a telegraph company that its responsibility for accuracy in the transmission of messages over its lines shall be restricted to repeated messages, and that any claim for damages must be made in writing within sixty days, is reasonable, and, unless waived, is binding upon one who sends a message with knowledge of it.

(*a*) A telegraph company had its rules printed at the head of its message blanks, accompanied by a stipulation that the message to be written on the blank was received subject thereto. At the Bradford oil exchange, on account of the peculiar nature and exigencies of the business transacted, the company dispensed with the use of these blanks and received and delivered messages orally.

4. In such case, the business, as thus conducted, being special and peculiar, as compared with the general and ordinary business of the company, it was not error to submit to the jury to find, whether, from the circumstance that the company had dispensed with the use of its blanks, it did not intend to relieve its patrons from the stipulations contained in them.

5. When a telegraph company engages, for a consideration, to furnish market quotations to a patron, it is bound to furnish them with accuracy, and is responsible for any damages resulting to the patron from his entering into a business contract in reliance upon quotations furnished by it which in fact are not accurate.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and MITCHELL, JJ.

No. 409 January Term 1889, Sup. Ct.; court below, No. 71 December Term 1885, C. P.

On October 13, 1885, the Western Union Telegraph Company brought assumpsit against C. P. Stevenson to recover a balance of $1,330.69, alleged to be due upon an account for messages sent and received by the defendant over the plaintiff's wires. The defendant pleaded non-assumpsit, payment and set-off.

At the trial on September 14, 1888, the following facts were shown:

Statement of Facts.

The plaintiff was engaged in a general telegraphic business between the principal towns and cities in the United States, including Bradford and Oil City, in Pennsylvania, and the city of New York. The defendant was an oil broker, engaged in buying and selling oil for himself and others, and was a member of the oil exchange at Bradford, Pa. To his business in that exchange he gave his personal attention, while he had agents in the oil exchanges at New York and Oil City, to whom he communicated his orders to buy and sell, by means of the plaintiff's lines.

The price of oil at these exchanges is constantly fluctuating, and there are frequently wide variations within a very few moments. Often there is a considerable difference between the price at one exchange and those at the others. To enable him to take advantage of these differences in prices, the defendant had an arrangement with the plaintiff to furnish to him regularly at Bradford the varying quotations of the oil market at New York and Oil City, and upon the quotations so furnished he based his orders to his agents at those places.

To facilitate the transaction of the business and to avoid the delays that would be caused, if messages had to be written out and carried from the floor of the exchange, the plaintiff established the practice of receiving for transmission verbal messages delivered to it through speaking tubes running from the floor of the exchange into an adjoining room where its operators were. The defendant had the use of such a speaking tube, through which his messages to his agents were delivered to the plaintiff's operators.

The plaintiff rendered to the defendant monthly statements of its charges for the transmission of messages and furnishing of quotations. Such statements were rendered for the months of July, August and September, 1885, amounting to $1,730.69. The defendant paid $400, on account of the July statement, which left a balance of $1,330.69, the sum for which the suit was brought.

The defendant claimed to set off against the plaintiff's account two items of damage which he alleged had been suffered by him in consequence of the negligence of the plaintiff. In support of these claims of set-off he testified that on July 8, 1885, he verbally instructed the plaintiff's operator at Bradford

to telegraph to his agent at Oil City to *sell* 50,000 barrels of oil at 97¾ cents, but instead of so doing the operator telegraphed to *buy* 50,000 barrels at that price. He also testified that on August 3, 1885, the plaintiff's operator gave him a quotation of the price of oil at Oil City at 99¼ cents, and, relying upon this information, he sent several orders to his agent at Oil City to make sales of oil aggregating 90,000 barrels, and gave orders to his New York agent to buy other oil in New York, where the price was lower that 99¼ cents, with which to cover these sales, but that, as he afterwards learned, the quotation so furnished to him was erroneous, the market price at Oil City being at that time only 98 cents and a fraction.

His counsel then proposed to prove by the defendant what was done by his agents in Oil City and New York in executing these orders, the financial results of the transactions and the damages resulting therefrom to the defendant, in consequence of the error in transmitting the order of July 8th, and of the misquotation of the market on August 3d.

It being conceded that the only knowledge the defendant had of the transactions carried on by his agents in the Oil City and New York exchanges, was derived from reports made to him by the agents of the contracts of purchase and sale entered into by them, the plaintiff objected to the proposed evidence as being hearsay and therefore incompetent.

By the court: Objection overruled; exception.[1]

The defendant then testified that on July 8, 1885, his agent at Oil City, in pursuance of the erroneous message which the plaintiff delivered to him, *bought* 50,000 barrels of oil, and this purchase, being followed by a break in the market, resulted in a loss to the defendant of $158.75; that in pursuance of the orders which the defendant gave on August 3d, in reliance upon the quotation furnished him by the plaintiff, his agents in New York and Oil City made purchases and sales of oil which produced a net loss to him of $713.35; that all these purchases and sales were reported to him at the time, by telegraph; that afterwards the oil was delivered to and by him in pursuance of the contracts so reported to him, and that he received and paid out, in pursuance of these contracts, the respective prices at which the several purchases and sales were reported to have been made.

Charge of Court below.

The plaintiff, in rebuttal, put in evidence a written contract between the plaintiff and the defendant, dated May 10, 1883, containing a clause showing that the defendant was at that time familiar with the rules and regulations of the plaintiff company, as printed upon its blank forms used for writing messages for transmission by it, and also put in evidence one of said message blanks containing its rules and regulations, which was in part as follows:

"To guard against mistakes or delays, the sender of a message should order it repeated; that is, telegraphed back to the originating office for comparison. For this, one half the regular rate is charged in addition. It is agreed between the sender of the following message and this company, that said company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same; nor for mistakes, or delays in the transmission or delivery, or for non-delivery, of any repeated message beyond fifty times the sum received for sending the same, unless specially insured. . . . . No employee of the company is authorized to vary the foregoing."

At the conclusion of the testimony, the court, MORRISON, J., charged the jury in part, as follows:

The plaintiff, the Western Union Telegraph Company, brings this suit against C. P. Stevenson, the defendant, to recover the amount of a bill which accrued in July, August and September, 1885, the balance of which they allege is $1,330.69. The claim has been put before you here, and proved in the manner which you have heard detailed by the witness, Mr. Howe, by statements which he says he made up, or caused to be made up each evening under his direction, of the business done through the day, which was for sending and receiving messages and furnishing quotations to Mr. Stevenson, the defendant. He says, in substance, that the bills that are produced here are the ones that were made up and presented to Mr. Stevenson monthly, I think; one in July, one in August and then one in September. And he says that he did it at that time, and he testifies to their correctness. . . . . Therefore, we say to you, that if that was all there was in the case, there is evidence from which

you might find that the defendant is liable for the amount of this claim, $1,330.69, if I recollect the figures correctly, with interest from the time it ought to have been paid, which probably was about October 1, 1885, or thereabouts.

Now the only questions in the case are raised on the part of the defence that is set up here. You will bear in mind that the evidence in this case shows that they were engaged in transacting a large business for this defendant, in sending and receiving messages, and receiving and sending them in an unusual way, and they had been doing this according to the evidence, for some time. That the defendant was paying the plaintiff large sums of money monthly, and they were receiving his messages verbally and transmitting them, and receiving from other sources and delivering them by their messengers verbally at the Bradford exchange. It seems to us under the peculiar circumstances of this case, and the way the business was being done, notwithstanding the rule providing for the repetition of the message to insure it, that when they receive a message or a large number of messages verbally and agree to transmit them, they are bound to transmit them as they received them. Therefore, it becomes a question for the jury as to whether they sent the message of July 8th to buy 50,000 barrels of oil, when it was delivered to them as the defendant alleges, to sell. We do not think this company can escape responsibility because it was not repeated, if you find as a matter of fact that Mr. Stevenson or his agent delivered the verbal message to them to sell oil, and they transmitted it "buy." But if it was his mistake, or his agent's mistake, then he cannot set up any damages that may have accrued to him on account of it.

At this time we will answer the numerous points that have been presented on part of the plaintiff, after which we will instruct you further. Counsel for plaintiff asks us to charge you:

1. That the plaintiff, being a telegraph company engaged in a general telegraphic business throughout the United States, may prescribe valid rules and regulations to insure safety and diminish loss in case of accident in the transmission of messages over its wires, and may declare that if the rules are not observed the party injured shall be precluded on the doctrine of contributory negligence.

Answer: Affirmed as a general proposition of law.

Charge of Court below.

2. If the jury believe from the evidence that the plaintiff did prescribe valid rules and regulations in regard to the transmission of messages, as contained on its printed blanks, and that the defendant knew of these rules and regulations at the time that he sustained the alleged damages, he is bound by said rules and regulations, although he did not send the messages upon the printed blanks.

Answer: Affirmed unless the jury find from the evidence, under our instructions in the general charge, that the plaintiff waived the regulations as to this defendant.[2]

3. If the jury believe from the evidence that the defendant requested the plaintiff's operator at Bradford to send a message to his agent at Oil City to sell 50,000 barrels of oil and the plaintiff's operator sent the message "buy" 50,000 barrels of oil, it is incumbent on the defendant to show by legal evidence that his agent at Oil City executed the order and that by reason thereof he sustained an actual damage thereby; and in the absence of such evidence there can be no off-set against the plaintiff's claim.

Answer: Affirmed as a legal proposition, but we do not mean to say that there is no evidence of the execution of the order and of the damages caused thereby.[3]

5. The court is requested to charge the jury that the defendant's oral testimony as to the purchase and sale of oil at Oil City and New York, as reported to him by his agent at Oil City and New York, the defendant being in Bradford at the very time the alleged purchases and sales were made, is hearsay and not the best evidence, and the alleged damage claimed by defendant has not been proven thereby, by legal evidence that can be submitted to the jury.

Answer: Under the evidence in this case we answer this point in the negative.[4]

9. If the jury believe from the evidence that the plaintiff did quote the Oil City market at 99 and a varying fraction, when the market at Oil City was 98 and a varying fraction, whereby the defendant sustained great loss, he can only offset as against the plaintiff's claim such damages as may be fairly supposed to have entered into the minds of the parties at the time they entered into the transaction. The action of the oil market was uncertain; it might advance or decline, and the

plaintiff's operator could not contemplate what it would have done were the message delayed; and if errors occurred the damages, if any, were wholly an unknown quantity and could not have been contemplated, and what was really contemplated was the tolls paid by the defendant for the quotations of the market, as expressed and agreed in the plaintiff's rules and regulations for the transmission of messages, as contained on the printed blanks, the contents of which were known to the defendant.

Answer: We answer this point in the negative.[6]

10. One of the conditions of the plaintiff's rules and regulations as contained on the printed blanks, provides that the company shall not be liable for damages unless notice of loss be presented in writing within 60 days from the time of loss. The defendant being familiar with such rules and regulations and not having presented any written notice whatever of his alleged claim for damages within the time prescribed, is precluded thereby and cannot defaulk the said damages against the plaintiff's claim in this action.

Answer: This point is affirmed, unless the jury find that this rule was waived or that the defendant had no notice of it. If it was not waived, and the defendant knew it, and you find that under the evidence, it correctly states the law.[5]

Now, gentlemen, in the view we take of this case, you will determine in the first place the amount that the plaintiff has as a legal claim against the defendant. We have given you that, and say to you that we think there is evidence enough to bring that before you, so that if there was no answer to it it would justify a verdict. You then pass to the defence, and the only defence for your consideration is the two items. The one of July 8th is the first, and not intending at this time to quote the evidence in detail to you, we will refer you to our recollection of a part of the defendant's testimony upon that transaction, to bring it before you. He says: . . . . .

This, gentlemen, is the first item of defence that your attention was called to. This, as I have already intimated, depends upon several important questions. The first is, did Mr. Stevenson deliver a verbal message to one of the agents of this plaintiff to send an order to Oil City to sell 50,000 barrels of oil, and did that agent through mistake send it, "buy"? As

we have already said, notwithstanding the printed rules that a person may insure by having the message repeated, that does not relieve the party, if they take the message, from sending it as they receive it. If they see fit in order to expedite business, or to get a man's custom, to take his messages verbally, they are, notwithstanding, under obligations to send them as he gives them to them.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

Notwithstanding the fact that they have printed rules and regulations, they can do business in other ways; and if the jury find that they saw fit to do business with this defendant in a different manner, disregarding these rules and not having the messages signed and put upon blanks or paper, but delivered verbally, and undertaking to receive, send and deliver them verbally, it was their duty to use care and skill in receiving and sending them and in the whole transaction of the business. If it was their mistake through the carelessness or negligence of their agents, we think it is an answer to so much of the claim. If Mr. Stevenson, as the testimony may show, was engaged in the transactions as he testifies, and the business was done as he says it was, and the oil sold, and on account of this mistake he suffered this loss, we think it would be a proper subject of set-off.

There are only two items in this defence, and the next is the one of August 3d, and we will give you a brief summary of Mr. Stevenson's evidence upon that.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

Now in this connection you will bear in mind that he says he had a contract with the plaintiff to furnish these quotations. I think a considerable part of the plaintiff's claim was made up of charges for these quotations. You will remember how that is. The bills will probably be handed to you. As we recollect, he was paying them for these quotations, and of course they were bound to give the quotations correctly; and if it be true that they gave him the quotations in the manner that he details here, higher than they were, and that induced him to do this business until he had lost this amount of money, he would be entitled to set it off against the plaintiff's claim. When he was paying them for the quotations, the contract would be implied, if not expressed, that they should furnish them to him correctly.

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

Arguments.

The jury returned a verdict in favor of the plaintiff for $517.06, and judgment was entered thereon. Thereupon the plaintiff took this writ, assigning for error:

1. The admission of defendant's offer.[1]

2–6. The answers to plaintiff's points.[2 to 6]

*Mr. J. B. Chapman* and *Mr. Silas W. Pettit* (with them *Mr. W. B. Chapman*), for the plaintiff in error:

1. As the defendant, on whose testimony alone the set-off was allowed, had no knowledge of the various purchases and sales which went to make up the transactions to which he testified, except what he learned through reports received from his agents, the testimony delivered by him was mere hearsay and should not have been admitted: 1 Greenl. Ev., 99; Queen v. Hepburn, 7 Cranch 290; United States v. Reyburn, 6 Pet. 352. The telegrams and letters, through which he received the reports of his agents, could not have been admitted in evidence themselves: Cummings v. Gann, 52 Pa. 484; Paull v. Mackey, 3 W. 110. It follows, that he could not testify as to information derived from such inadmissible telegrams and letters. The plaintiff was entitled to have the best evidence produced, viz.: the written telegrams sent to and received by the defendant's agents, and the testimony of the agents themselves as to what they did in pursuance of them; and the plaintiff was also entitled to have the opportunity to cross-examine the men who carried on the alleged transactions. No fair reason can be assigned for the failure to produce them.

2. The defendant was bound by the rules and regulations of the plaintiff company, as contained in its printed blanks. He was familiar with these rules; and, although the messages sent by him were principally verbal messages, they were so sent at his request, and there is not a particle of evidence that the plaintiff waived its rules in receiving them. The defendant took upon himself the extra risk, incident to the use of verbal messages, for his own convenience in carrying on his business. The fact that verbal messages were transmitted, could not raise a presumption of a waiver of the plaintiff's rules, and those rules were binding on the defendant: Wolf v. Telegraph Co., 62 Pa. 83; Passmore v. Telegraph Co., 78 Pa. 239. The rule as to damages for errors in unrepeated messages was reasonable:

Schwartz v. Telegraph Co., 18 Hun 159; Western Union Tel. Co. v. Carew, 15 Mich. 525; Young v. Telegraph Co., 65 N. Y. 163; Wolf v. Telegraph Co., 62 Pa. 83. So is the rule requiring the presentation of a claim in writing within sixty days: Wolf v. Telegraph Co., 62 Pa. 83; Passmore v. Telegraph Co., 78 Pa. 239; Farnham v. Railroad Co., 55 Pa. 53. Not having complied with these rules, the defendant cannot maintain his set-off, especially since the burden was on him to show gross negligence or misconduct on plaintiff's part, which he has not done: Western Union Tel. Co. v. Buchanan, 35 Ind. 429; (9 Am. Rep. 744); Baldwin v. Telegraph Co., 45 N. Y. 752; (6 Am. Rep. 165); Hart v. Telegraph Co., 66 Cal. 579 (55 Am. Rep. 119).

*Mr. J. W. Lee* (with him *Mr. F. W. Hastings* and *Mr. G. S. Criswell*), for the defendant in error:

1. The defendant's testimony as to purchases and sales of oil at New York and Oil City was admissible. The orders for these transactions were given by verbal messages delivered to the plaintiff. The replies to these messages, reporting the execution of the orders came back through the plaintiff, and the defendant testified that he paid for the oil purchased and received for the oil sold, the same prices at which it was reported to him, through the plaintiff, that these purchases and sales had been made.

2. Stipulations in printed blanks as to repeating messages do not relieve the telegraph company from responsibility for negligence in delivering an incorrect message to a third person: N. Y. & W. P. Tel. Co. v. Dryburg, 35 Pa. 298. The real ground of the decision in Passmore v. Telegraph Co., 78 Pa. 239, was contributory negligence of the plaintiff. Here, the company, by dispensing with the use of its blanks, relieved the defendant from any stipulations contained in them. The defendant never assented to the stipulations. Express assent is not claimed, and tacit assent is negatived by the manner of doing the business.

OPINION, MR. JUSTICE CLARK:

The defendant, C. P. Stevenson, at the time the matters involved in this suit occurred, was a member of the Bradford oil exchange, and was engaged in buying and selling oil on his

own account and as a broker for others.   The Western Union
Telegraph Company, for a certain stipulated sum per month,
agreed to furnish him accurate quotations of the price of oil
from the exchanges in New York and Oil City.   The oil mar-
ket, being exceedingly sensitive, was subject to the most fre-
quent, indeed almost momentary, changes ; and these changes,
it would seem, varied slightly in the various markets, so that a
person might at times, by carefully noting the quotations, buy
in one market and sell in another.   Transactions in the ex-
change were very rapid, and were noted generally upon mere
memoranda until the close of the day's business.   Success in
buying oil in one market, to sell in another at a profit, there-
fore, rested wholly in the accuracy of these quotations upon
which the dealer is necessarily obliged to depend.

Acting upon these quotations the defendant had various
transactions in the purchase and sale of oil, which were con-
ducted by telegrams transmitted over the plaintiff's lines, for
which telegrams he paid or agreed to pay at certain specified
rates.   In establishing his set-off, the defendant certainly had
a right to show what quotations were given him by the com-
pany from the New York and Oil City exchanges, and what
he did relying upon their accuracy ; that he dictated certain
messages for transmission over the company's lines, directing
the purchase and sale of oil by his agents, and received from
the operators of the company certain messages in reply.   The
correspondence was notice to the company that the defendant
acted upon the quotations given.   When the defendant says
that he bought or sold a certain number of barrels of oil in Oil
City or New York, he states that he was not present in those
places at the time, but that he directed such purchase or sale
by telegram over the company's wires.   What he speaks of
doing in Oil City or New York, he admits that he merely di-
rected to be done; but he afterwards states that he knows
what he directed to be done was done, for the oil bought or
sold was actually delivered, the various transactions settled,
and the money received or paid out in accordance with his di-
rections.   The testimony of the agents who effected each of
the several sales and purchases of oil, or of those with whom
the agents dealt, would doubtless have afforded more direct
proof of the fact, but it would have been proof of the same

grade offered. The defendant testified to what he personally knew, and of which his agents were probably ignorant; he testified to the consummation of the contracts which his agents reported through the plaintiff, they had made.

In requiring the production of the best evidence applicable to each particular fact, it is meant that no evidence shall be received which is merely substitutionary in its nature, so long as the original evidence can be had. The rule excludes only that evidence which itself indicates the existence of more original sources of information; but where there is no substitution of evidence, but only a selection of weaker instead of stronger proofs, or an omission to supply all the proofs capable of being produced, the rule is not impinged: Greenleaf, 82. The warden of a penitentiary would perhaps be able to give the strongest proof that a person had been, at a particular time, a convict imprisoned in the penitentiary, as he keeps a registry in which is noted the exact time of the admission and discharge of the convict; but the fact may be shown by any other competent proof: Howser v. Commonwealth, 51 Pa. 332. The date of a birth, or death, or of a marriage could best be established by a person present at the event, but any other legal proof is admissible for the purpose. Handwriting may be proved by another, without calling the writer; or a sale of oil or of any other commodity may be shown by the acts or declarations of the parties, although a witness may have been actually present and fully conversant with the whole transaction. As between living witnesses, one is not to be excluded because another had a better opportunity of knowing the fact alleged and attempted to be shown. We are of opinion, therefore, that the evidence of the defendant, although perhaps not the strongest proof, was sufficient to send the case to the jury, on the questions raised by the defence.

The defendant alleges, as the first matter of the defence to the plaintiff's claim, by way of set-off, that on the morning of the 8th of July, 1885, he had on hand about 97,000 barrels of oil; that the market at first advanced, and he bought 40,000 more; that the market then indicated a break, and he gave to the company a verbal message to his agent at Oil City, to *sell* 50,000 barrels at 97¾; that the company failed to send the message as directed, but instead negligently sent a message to the

agent to *buy* 50,000 at that price; the market price being about 97 to 97¼. He says he called the company's attention to the error at the time, and that his actual loss in the transaction was $178.75. That the order dictated to the messenger was an order to *sell* and not to *buy*, is established by the verdict of the jury, and the case must be considered upon the assumption of this fact. As against this claim of the defendant, the plaintiff interposes the rule of the company printed at the head of their message blanks, to the effect that " the company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery, of any unrepeated message, whether happening by negligence of its servants or otherwise, beyond the amount received for sending the same," etc. That the company may make reasonable rules, not inconsistent with the public good, affecting the measure of their responsibility in the ordinary course of telegraphy, is settled in Passmore v. Telegraph Co., 78 Pa. 239. In that case, this court held, adopting the language of Judge Hare, that the rule or regulation now in question was not so far contrary to private interests or the public good as to justify a court of justice in pronouncing it invalid. " A railway, telegraph, or other company," says the learned judge, " charged with a duty which concerns the public interest, cannot screen themselves from liability for negligence; but they may prescribe rules calculated to insure safety, and diminish the loss, in the event of accident, and declare, if these are not observed, that the injured party shall be considered in default and precluded by the doctrine of contributory negligence." In the case at bar, however, the ordinary blanks upon which these regulations and restrictions were printed were not used, and the manner of conducting the business was somewhat peculiar. The great number and variety of the transactions, and the rapidity with which they were necessarily conducted, gave occasion for a large amount of telegraphic communication of a complex character. Momentary changes in the market demanded the utmost dispatch in telegraphic communication; written messages were dispensed with in the business of the exchange. All the messages were given to the operator verbally; not one in a thousand was written. The members of the exchange, standing about the ring, whispered the messages they wished to send into the ear of a messenger boy employed

by the company, and he communicated the message to the operator. For a part of the time, they were conveyed through a speaking tube from the defendant's room to the ear of the operator. The exigencies of the business were such as to require that the usual methods of procedure should be dispensed with; there was not time to write the messages. The company would appear to have undertaken to transmit these messages correctly without reducing them to writing, either at the place of reception or delivery; the company received them orally and delivered them orally. The business, as it was conducted in the exchange, compared with the general and ordinary business of the company, was special and peculiar, and it was a question for the jury whether or not, under the circumstances, the company, by dispensing with the use of the blanks, did not intend to relieve their patrons from the stipulations contained therein. Such an inference might fairly be drawn from the extraordinary manner in which the business was conducted. We cannot say there was no evidence to justify such an inference. If there was a rule of the company by which its responsibility for the accuracy of messages transmitted over its lines was restricted to such as were repeated, and that any claim for damages must be made in writing within sixty days, the defendant was bound by such rules, if he had any knowledge of them, and they had not been waived or dispensed with by the company in its dealings with the defendant. These were questions of fact which were properly submitted to the jury.

The defendant further claims damages sustained by reason of a misquotation of the market at Oil City. On August 3, 1885, oil at Oil City was quoted to the defendant at 99 and a fraction. Relying upon the accuracy of this quotation, the defendant ordered his agent at Oil City to sell 90,000 barrels. It turned out, however, that the quotation furnished was inaccurate, and the loss was $713.35. As the company had contracted to furnish the defendant the quotations of the New York and Oil City markets, it was bound to furnish them with accuracy, and the defendant was justified in relying upon them. The questions bearing upon this branch of the case have already been considered, and we do not wish to repeat what has been said.

We think the learned judge of the court below was right in his instructions to the jury, and the

Judgment is affirmed.