## Selma Savings Bank v. Webster County Bank.

## Selma Savings Bank v. Farmers National Bank.

(Decided December 20, 1918.)

### Appeals from Webster Circuit Court.

1. Bills and Notes—Agreement by Telegram to Pay Check—Negotiable Instruments Law.—A telegram agreeing to pay a check is a writing within the meaning of the Negotiable Instruments Law requiring that the acceptance of a bill must be in writing signed by the drawee.

2. Telegraphs and Telephones—Delivery of Message.—Where a telegraphic message is dictated over a telephone, and is thus received by a telegraph company for transmission, it will be considered as if the message had been delivered in the usual and more formal mode of sending telegrams.

3. Telegraphs and Telephones—Agency.—A telegraph operator who, in the usual course of his company's business, and in the line of

his employment, receives telegrams by telephone for transmis sion, is the agent of the telegraph company in performing those duties.

4. Banks and Banking—Agreement by Telephone to Pay Check— Agency.—Where a bank cashier delivered to a telegraphic operator, by telephone, a message for transmission, accepting and agreeing to pay a check therein specified, the telegraphic operator was the agent of the telegraph company, and the bank sending the telegram is liable upon its acceptance under subsection 19 of the Kentucky Negotiable Instruments Law providing that "the signature of any party may be made by an agent duly authorized in writing."

5. Banks and Banking—Acceptance—Payment of Check.—Where a bank, in response to an inquiry whether it would pay T's check "up to $2,000.00," replied that it would honor T's check "for $2,000.00," it will be required, under its acceptance, to pay T's check for $1,957.50.

E. B. ANDERSON, ERNEST WOODWARD and W. FOSTER HAYES for appellant.

HUNT & BENNETT, BOURLAND & BLACKWELL and G. L. WITHERS for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

As the questions presented in these two appeals are identical they will be considered and decided together. The appellant, Selma Savings Bank, an Iowa banking corporation doing business in Selma, Iowa, was the plaintiff in each case; the two appellees, the Webster County Bank, and the Farmers National Bank, banking corporations doing business in the city of Clay, Webster county, Ky., were the defendants in the respective cases, and are the appellees here.

James W. Nall, of Webster county, was a customer of the appellee, the Farmers National Bank; and J. L. Townsend, Jr., of the same county, was a customer of the appellee, the Webster County Bank. J. A. Baldwin, an Iowa cattle dealer sold certain cattle to Nall and Townsend. In payment of his cattle so purchased, Nall, on February 13th, 1917, drew his check on the appellee, Farmers National Bank, in favor of Baldwin for $1,957.50; and, on the same day Townsend drew his check, for the same amount, and in favor of Baldwin, on the appellee, the Webster County Bank. On the same day Baldwin endorsed these checks and offered to sell them to the appellant, the Selma Savings Bank; but be-

fore that bank would buy either of the checks, it telegraphed the two Kentucky banks asking if the checks would be honored. The telegram to the Farmers National Bank reads as follows:

"Selma, Iowa, Feb. 13, 1917.

"Farmers National Bank, Clay, Ky.

"Will you pay check of Jas. W. Nall up to $2,000.00, for cattle?

"Selma Savings Bank."

On the same day the Farmers National Bank answered this telegram by another, in the following language:

"Clay, Ky., Feb. 13, 1917.

"Selma Savings Bank, Selma, Iowa.

"We will honor James W. Nall's check for $5,000.00 when properly signed.

"Farmers National Bank."

The telegram to the Webster County Bank was as follows:

"Selma, Iowa, Feb. 13, 1917.

"Webster County Bank, Clay, Ky.

"Will you pay check of J. L. Townsend, Jr., up to two thousand dollars, for cattle?

"Selma Savings Bank."

In response thereto the Webster County Bank answered:

"Clay, Ky., Feb. 13, 1917.

"Selma Savings Bank, Selma, Iowa.

"We will honor J. L. Townsend, Jr.'s check for two thousand dollars.

"Webster County Bank."

After receiving these assurances from the two Kentucky banks the Selma Savings Bank cashed the checks, paying therefor their face value; and, in due course it presented them to the respective appellees for payment, which was refused. The Selma Savings Bank thereupon filed these actions against the two Kentucky banks; and demurrers having been sustained to the petitions and the petitions dismissed, the plaintiff appeals.

The petitions are in the usual form, setting forth the above facts. In response, however, to a motion by the defendant, in each case, to require the plaintiff to file the checks and the telegrams referred to, the plaintiff

filed the original check in each case, and further stated that neither of the telegrams was in its possession, but that the facts with reference thereto, in the case against the Farmers National Bank, were as follows:

"The telegram dated February 13, 1917, at Selma, Iowa, and addressed to the defendant was sent by the plaintiff in regular course over the Western Union Telegraph line from Selma, Iowa, to Madisonville, Ky.; that there is no telegraph office or agent in Clay, Ky., and that Madisonville, in Hopkins county, is the nearest office of the Western Union Telegraph Company to Clay, Ky.; and, that said message sent by defendant as aforesaid was delivered by the Western Union Telegraph Company to the Cumberland Telephone and Telegraph Company at Madisonville, on February 13, 1917, in the usual and regular course of business. The said message was delivered to the defendant on said date by the operator of the Cumberland Telegraph and Telephone Company at Madisonville, telephoning the contents thereof to the cashier of the defendant and that said defendant and said cashier could have procured a written copy thereof by requesting the same.

"That immediately after receipt of the message quoted in the petition from plaintiff to defendant, and on the same day, the defendant, acting by and through its cashier, telephoned to the telegraph company the message quoted in the petition as addressed from the defendant to plaintiff, and caused the same to be transmitted in regular course of business to the defendant (plaintiff) on February 13, 1917, which date said message was delivered to defendant (plaintiff) in regular course by the Western Union Telegraph Company, and was and is in writing and was and is as quoted in the original petition."

The response in the case against the Webster County Bank was the same in substance, the only difference being it stated that the message from the defendant to the plaintiff was telephoned to the Postal Telegraph Company at Wheatcroft, Ky., and by it was delivered to the Western Union Telegraph Company at Louisville, and by the Western Union Telegraph Company to the plaintiff. By agreement it was ordered that the response in each case should be taken as an amended petition, and it was so treated by the demurrer.

The circuit court was of the opinion that no recovery could be had because there was no written acceptance or certification of the checks, signed by the defendants, or by an agent of the defendants duly authorized in writing, as required by section 19 of the Kentucky Negotiable Instruments Law. (Ky. Stats., sec. 3720b, subsec. 19.) It was not contended that the acceptance or certification of the check could not have been made by telegram; but as the telephone had been used in the transmission of the message, the telegraphic answers thus sent by the two Kentucky banks could not be considered as writings signed by the defendants. This means, either that the circuit court was of opinion that telegrams are not to be treated as writings signed by the defendants, or that the telegraphic operators at Madisonville and Wheatcroft were agents of the Kentucky banks, in forwarding the messages, and that neither of them had been authorized to do so in writing.

Preliminary to a discussion of the facts, we quote here for convenience, the following sections of the Kentucky Negotiable Instruments Law, which are subsections to section 3720b of the Kentucky Statutes:

"Subsec. 19. The signature of any party may be made by an agent duly authorized in writing."

"Sec. 132. The acceptance of a bill is the significance by the drawee of his assent to the order by the drawer. The acceptance must be in writing and signed by the drawee. It must not express that the drawee will perform his promise by any other means than the payment of money."

"Sec. 134. Where an acceptance is written on a paper other than the bill itself, it does not bind the acceptor except in favor of a person to whom it is shown and who, on the faith thereof, receives the bill for value."

"Sec. 185. A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this act applicable to a bill of exchange payable on demand apply to a check."

"Sec. 187. Where a check is certified by the bank on which it is drawn, the certification is equivalent to an acceptance."

"Sec. 189. A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder, unless and until it accepts or certifies the check."

It will be observed that the requirement that the acceptance must be in writing, signed by the drawee, is practically the same as that found in the statute of frauds requiring that the contract, or some memorandum of it, must be in writing signed by the party sought to be charged. The reason in each case is that sound policy requires some substantial and tangible evidence of the contract, and more reliable in its nature than the statements or recollection of witnesses. It is, however, well established that a telegram satisfies the requirement of the statute of frauds. 20 Cyc. p. 255; Ryan v. United States, 136 U. S. 68; Bibb v. Allen, 149 U. S. 481; Brewer v. Horst-Lachmund Company, 127 Cali. 643, 50 L. R. A. 240; Leesley Bros. v. A. Rebori Fruit Co., 162 Mo. App. 203. This rule is sustained by both reason and authority.

In Howley v. Whipple, 48 N. H. 487, the court said:

"When a contract is made by telegraph, which must be in writing by the statute of frauds, if the parties authorize their agents, either in writing or by parol, to make a proposition on one side and the other party accepts it through the telegraph, that constitutes a contract in writing under the statute of frauds, because each party authorizes his agents, the company or the company's operator, to write for him; and it makes no difference whether that operator writes the offer or the acceptance in the presence of his principal, and by his express direction, with a steel pen an inch long attached to an ordinary penholder, or whether his pen be a copper wire a thousand miles long. In either case the thought is communicated to the paper by the use of the finger resting upon the pen; nor does it make any difference that in one case common record ink is used, while in the other case a more subtle fluid, known as electricity, performs the same office."

See also note in 110 American State Reports, page 760.

The substance of the amended petitions being that the defendant banks had, by telephone, delivered to the telegraph companies the messages transmitted by those companies and received by the appellant, including, of course, the signatures of the respective parties, the question arises did these facts constitute the signing of a written acceptance by the respective Kentucky banks? We think they did. The existence of a tangible written

memorial, which is the main reason for requiring a writing, would seem to be satisfied in this way just as fully as if the officers of the defendant banks had with their own hands written these messages; and under the authorities above quoted they certainly had the right to adopt that means of making the written communication.

To elucidate the subject, let us suppose that the cashier of the Farmers National Bank had written its telegram in its office by dictating it, signature and all, to a typist, and that the telegram thus written had been delivered to the telegraph company and transmitted by it to the Iowa bank, could any doubt arise as to its being a writing signed by the bank although the operator of the typewriter had no written authority to sign the name of the bank, but wrote at the dictation of the cashier? We do not understand the appellees to so contend.

Or, suppose the cashier of the Webster County Bank had called a public stenographer and dictated and delivered the telegram in the same way, no different or new question would be presented, since the two supposed cases are practically identical in principle. Furthermore, they are practically identical with the transaction that actually happened in the cases before us, since the proper officers of the two banks simply called the telegraph operator and dictated to him the telegram, including the signature. The mechanical means of making and signing the writing are not important, in view of subsection 190 of the negotiable instruments law providing that "written" includes printed, and "writing" includes print.

In Western Union Telegraph Co. v. Corso & Son, 121 Ky. 328, there was a question as to whether a certain deposition should have been suppressed. The language of the opinion states the facts and the reasons for the ruling as follows:

"Afterwards, on February 4, 1904, for the first time, an exception was filed asking a suppression of the deposition on the ground that the deposition was not written either by the witness or by the officer. An affidavit of the notary was furnished to both parties, detailing the manner in which the deposition was taken, and these affidavits were filed on April 11, 1904, which shows a literal compliance with the provisions of our Code with

reference to the taking of depositions and the certificate of the officer thereto, except that the questions and answers were written in shorthand by the notary's clerk in the presence of the witness and the notary and then transcribed by this clerk.

"It is contended by appellant that this is an infraction of sec. 582 of the Civil Code of Practice, which provides that the officer's certificate shall, among other things, show that it was written and subscribed by the witness in the officer's presence, or was written by the officer in the presence of the witness, and read to and subscribed by the witness in the presence of the officer. The purpose of this provision was to procure an authentic statement of this witness under oath, and also that it be definitely ascertained to what the witness has made oath, and therefore either that the witness himself shall write the deposition or that the officer shall write it, and, when the officer writes it, to bring it directly to the attention of the witness after it is written, it must be read over to and subscribed by him. The object of having the officer write the deposition is to prevent the substitution of false depositions or the coloring of answers by having them written by parties who are interested in the litigation. It was not intended by the Code that the officer should do the manual labor of writing the deposition. The purpose was that the officer should be responsible for its writing, and that he in person should supervise its writing, and therefore that the writing of the deposition should be his act. An act done under the direction, in the presence of, and under the immediate supervision of an officer is no less an act done by him because, perchance, he employs the labor of some third person. The intervening labor does not lose the personality of the officer under whose direction and personal supervision it is done. We, therefore, conclude that an act is still the official act of the officer, though not personally done by him, if it is done under his direction and his immediate personal supervision. This construction is sustained by the following cases from other states: Tuthill v. Smith, 90 Iowa, 331, 57 N. W. 853; Crossgrove v. Himmelrich, 54 Pa. 203; Read v. Randall, 2 Har. (Del.) 501; Stoddard v. Hill, 38 S. C. 385, 17 S. E. 138; Cushan v. Wooster, 45 N. H. 412."

Again, in Lamaster v. Wilkerson, 143 Ky. 226, the valadity of a school election was involved. Section 4481 of the Kentucky Statutes required that notice of the election should be signed by the trustees. In holding that notices bearing the printed signatures of the trustees were sufficient, the court said:

"Complaint is made of the judgment on two grounds: 1st, that the posters giving notice of the election were not signed by the members of the board of trustees; and that their names appearing thereto were merely printed instead of being signed in their own handwriting. 2nd. That the clerk and one of the judges of the election were not authorized to act as such, because they were illegally appointed by only two of the five members of the board of trustees. For the foregoing reasons it is argued by the counsel for appellant that the election was void, and therefore, the bonds are invalid and should not be sold.

"Neither of these contentions is sound. As to the first it would perhaps be sufficient to say that the posters giving the voters of the district notice of the time, place and hours of the election were doubtless printed from the original notice of manuscript prepared by the trustees in which each of them will be presumed, in the absence of allegation and proof to the contrary, to have attached his official signature. If this view of the matter should be rejected, there is still the presumption altogether reasonable and legal, that the trustees, considering the fact that it is admitted they caused the notice to be printed and posted, authorized the printing of their names on them and adopted them as their signature. In either case there was a substantial compliance with the statute (section 4481, Ky. Sts.), which requires that the election notices be signed by the trustees.

"In legal contemplation to sign means to attach a name, or cause to be attached, by any of the known methods of impressing the name on paper with the intention of signing it. Words and Phrases, 6512.

"In 36 Cyc. 448, we find this statement of the law on the subject:

" 'Signatures adopted by persons are sufficient to give validity to instruments even though typewritten, or printed.' Herrick v. Merrill, 33 N. W. 849."

From these authorities we are of opinion that the telegrams in these cases were in writing and were signed by the appellee banks within the meaning of the require-

ment that an acceptance must be in writing and signed by the drawee.

But appellees insist their signatures are not binding upon them for the reason that their telegrams were not signed by their respective agents authorized in writing, as is required by section 19 of the negotiable instruments law, above quoted. And we are advised by the briefs that the circuit court rested its judgments upon that ground.

The requirement that the authorization of the agency must be in writing, is peculiar to the Kentucky Negotiable Instruments Law. Usually, it is provided in similar laws of other states that the agency may be shown as in other cases.

The petitions as amended do not state that the bank cashiers reduced their telegrams to writing and signed them before sending them over the telephone, which is usually done for the purposes of accuracy and retaining a copy; they merely allege that the cashiers telephoned their telegrams to the telegraph company, addressed to the plaintiff, and caused them to be transmitted and delivered to the plaintiff, in the usual and regular course of business.

The defense relied upon assumes that the telegraphic operator at Madisonville, was the agent of defendant bank when he signed the bank's name to the telegram to plaintiff, and having no written authority to do so, his act did not bind the bank.

There are some cases holding that where messages are received over a telephone, or orally, by a telegraph company for transmission, the operator receiving the message is the agent of the sender of the message. Most, if not all of the cases of this class, are suits against the company for negligence in handling the message, in which it interposed its rules, limiting the recovery.

Upon the authority of two Alabama cases and several Texas cases, Cyc. formulates the following rule:

"Where the message is written on the blank by one of the company's messengers or operators at the dictation and request of the sender, the messenger or operator is, for this purpose, the sender's agent, and the latter is bound by the stipulations as though he had written the message himself; and in such cases it is not material, in the absence of fraud or misrepresentation, that the sender did not read such stipulations, or even that he was unable to read or write, or did not know of the existence of such stipulations." 37 Cyc. 1694.

The same work further says:

"If a telegraph company accepts for transmission a message offered to it over a telephone, and the operator without the knowledge or direction of the sender writes the message upon one of the company's blanks, the sender will not ordinarily be bound by the stipulations contained thereon, particularly where he did not know of such stipulations or intend or expect the message to be written upon such blank." Ib. p. 1695.

But if the operator is the sender's agent in one case he would seem to be equally so in the other.

We think, however, that the best considered cases are to the effect that where telegrams are given by telephone, or orally, the operator, so long as he is attending to the usual business of the company, is the agent or servant of his company.

In Shawnee Milling Co. v. Kansas P. T. Cable Co. (Kan.), 166 Pac. 493, L R. A. 1917F, 844, it was held that where a telegraphic message is dictated over a telephone and is thus received by a telegraph company for transmission, it will be considered as if it were written on the ordinary blank forms furnished by the company, and its liability for an error in transmission is neither greater, nor less, nor different, than if the message had been delivered in the usual and more formal modes of sending telegrams. If it is the customary way of doing business to receive telegrams over the telephone, what reason can there be for transforming the operator from a servant of his company into a servant or agent of a man who neither controls him nor pays him his salary?

In Carland v. W. U. T. Co., 118 Mich. 369, 43 L. R. A. 280, 74 Am. St. Rep. 394, Carland, residing at Corunna, Mich., called the office of the appellee, at that place, by telephone and dictated to the agent or operator a telegram to G. W. Wylie Company, at Chicago. Young, the company's operator negligently failed to send the message, and when sued for damages the company answered that Carland had made Young his agent to write and send the telegram and was therefore bound by the conditions of the contract limiting the company's liability. In overruling that contention the court said:

"It is contended that the contract to send the message was subject to the conditions which the defendant usually imposes upon its patrons; that Young was, by the plaintiff, made his agent to write the telegram upon the

blank containing the conditions; and that receiving a message upon any other terms than such conditions would be outside the scope of Young's authority. Young, being the person in charge of the defendant's business, and authorized to receive telegrams, was acting within the general scope of his authority in so doing, and the plaintiff was not bound, at his peril, to ascertain the secret instructions that the defendant had given in relation thereto. . . . Should it be said that Young, in receiving by telephone and writing such message, was the agent of the plaintiff? We are cited to several cases holding that the operator is such agent, under somewhat similar circumstances.''

Then, after reviewing the older Texas cases of W. U. T. Co. v. Edsall, 63 Tex. 677; W. U. T. Co. v. Foster, 64 Texas, 220, 53 Am. Rep. 754; Gulf, C. & S. F. R. Co. v. Geer, 5 Tex. Civ. App. 349, seeming to sustain a contrary doctrine, the court said:

''It seems to us that in the cases cited the Texas court went too far if it took judicial notice that the scope of the agent's authority did not permit him to write messages for those desiring to send them, who, from infirmity, were incapacitated from writing the same, or were, from ignorance, unable to do so. The law does not forbid such authority, nor does it make it the duty of the sender to write the message. If the rules of the company forbade it, there is nothing in the case to show that the fact was brought home to the knowledge of the patron, and the rule would have no greater force than any other of which he was ignorant. We cannot conclude, in the absence of proof, that the telegraph companies expect their operators to turn away patrons who cannot write, or that they keep telephones in their office, but do not permit their use in their business by their patrons who send and receive messages. And we are of the opinion that such use should not be altogether at the peril of the patron, or that he should suffer for mistakes made at either end of the line, merely because such are the instructions to the operator, or made the subject of a rule of which the patron has no knowledge. It would seem more reasonable to hold such acts to be within the general scope of his authority, or, at least, hold it to be a question for a jury. There is sufficient justification for the decisions in the Edsall case without invoking such a rule, for the sender signed the message upon the blank,

thus making it his own, under the current weight of authority that so holds, although the conditions be not read. 25 Am. & Eng. Enc. Law, 805, and cases cited in Note 1. So, in the case of Gulf, C. & S. F. R. Co. v. Geer, the message was written upon the blank by request. The Foster case more nearly sustains plaintiff's contention. We are cited to no authorities in support of the Texas cases. We are of the opinion, therefore, that the court committed no error in holding that Mr. Young acted as agent for the defendant, under the proofs contained in the record; and might properly have instructed the jury that he was not shown to have acted as agent for the plaintiff.''

In Bowie v. W. U. T. Co., 78 S. C. 424, where a message was sent to the company by telephone, the company relied on the stipulation in its message blank to excuse it for liability for any mistake in transmission. In discussing the liability of the company in that case, the court said:

''There was no evidence that the sender assented to the stipulation or knew it was written on the company's blank, or that he intended or expected the message to be written on the blank. In the absence of such evidence, we can see no ground whatever for the company to say a delivery and acceptance over a telephone kept in its office was not a proper delivery. Certainly, the defendant has no right to complain when the circuit judge, assuming that there might be some evidence bringing the stipulation home to the sender, in response to the defendant's request, charged, if the regulation on the message blank was reasonable, and brought to the knowledge of the sender, he would be bound by it, and the company would incur no liability in reference to the telegram until it had been presented and accepted at one of its transmitting offices, unless the company had seen fit to waive the regulations by inviting or encouraging the sender or the public to deliver to it messages in some other way.''

In Mims v. W. U. T. Co., 82 S. C. 247, it was held, under evidence that the sender of a message dictated it to a girl who wrote it down and read it to the company's agent, there being no evidence that the sender had any notice or knowledge of the regulations on the back of the blank messages, and there being uncontradicted evidence that the girl had no notice or knowledge thereof, that the agent of the company who took the message from the girl was in that act the agent of the company

and not of the sender as stipulated on the message blanks.

Again, in W. U. T. Co. v. Todd (Ind. App.) 53 N. E. 194, Chapman wrote out a telegram and dictated it to the telegraph company over the telephone, and in its transmission it was so materially altered in the address that it could not be delivered. By way of defense the company answered that in writing the message the operator was the agent of Chapman, and that any mistake made by the operator was the mistake of Chapman, for which the company was not liable.

In deciding that point against the company, the court said:

"It may perhaps be true that the servant of the telegraph company as to a matter not within the authority conferred on him expressly or implicitly by the company can be for the time, in a particular act, the agent of a sender of a message. The ordinary duty of a clerk or employe who is held out to the public as a receiver of messages at the transmitting office, and who has not express authority to do more, cannot bind the company as its servant outside of such apparent duty, and beyond the scope of his employment. But where the company, in receiving a message orally by telephone, is pursuing a custom of so accepting patronage from the sender and others, we cannot agree that the company so carrying on its business for its own convenience and profit may thereby relieve itself from the obligation to exercise the skill and diligence which such a method demands. If such be a customary method of receiving messages, it cannot be claimed that a message so received and transmitted over the wires for the usual hire was not received by the company, or that in the act of receiving and writing down the message the company's employe was acting as the servant of the sender."

In Markely v. W. U. T. Co., 159 Iowa, 557, a case involving the liability of a telegraph company for the negligence of its operator in receiving a message over a telephone, the court in holding the operator to be the agent of the company said:

"The defendant is not bound to keep a telephone in its office, over which messages may be sent to it to be forwarded. If it does so, it must be held to the exercise of reasonable care in thus receiving messages. It had the right to require all tendered messages to be in writing,

and to make such reasonable rules as might be necessary for its own protection and for the accurate care of its business; but in the absence of any showing that there were such rules, which were known to the sender of the message, it must be presumed that the use of the telephone was a means permitted by it to be employed in receiving messages for forwarding. So permitting it, if there was negligence on the part of its agent in receiving the message, such would be the negligence of the defendant.''

To the same effect see W. U. T. Co. v. Powell, 94 Va. 268; Will v. Cable Co., 37 N. Y. S. 933. See also W. U. T. Co. v. Stevenson, 128 Pa. 442, 5 L. R. A. 515.

So far as we have been able to learn the courts of Alabama, Maryland and Texas, are the only tribunals announcing a contrary rule, and some of those cases can be distinguished and shown not to be in real opposition, particularly the later cases from Texas. See W. U. T. Co. v. Uvalde Nat. Bank (Tex. Civ. App.), 72 S. W. 232; Gore v. W. U. T. Co. (Tex. Civ. App.), 124 S. W. 977; W. U. T. Co. v. Douglas, 104 Tex. 66; W. U. T. Co. v. Parham (Tex. Civ. App.), 152 S. W. 819; Tex. Tel. & Tel. Co. v. Seiders, 9 Tex. Civ. App. 431.

The result, according to the weight of the authorities, is, that where a telegraph company is accustomed to receive messages by telephone for transmission by telegraph, the agent receiving the message will not be regarded as the agent of the sender. 56 L. R. A. 745, Note.

This conclusion is in harmony with the acts and intentions of the parties. Appellant did not understand it was dealing with appellees through an agent. If an agency existed it was hidden from the Selma Bank. No one claimed to be so acting, at the time. Neither the operator, the telegraph company, nor the defendants are claiming by any pleading in these cases, that the operator was the agent of the Kentucky banks; it is so urged only in argument; and we are asked to so hold as a matter of law regardless of the manner in which business of this character is usually conducted. But, as was said in the Shawnee Milling Co. case, *supra,* a message dictated to the operator over the telephone, must necessarily in this busy and practical age, be treated as if it were written on the ordinary blank and received and transmitted in the ordinary way—neither more nor less.

So, we get back to the original proposition, that this is the usual case of sending a telegram, without any supervening question of agency; and, as heretofore seen, telegrams constitute a writing sufficient to satisfy the statute. Our conclusion is that the operators at Madisonville and Wheatcroft were not the agents of the defendants; and the question of agency being eliminated, we do not understand that the Kentucky banks deny their liability.

We have been referred to section 482 of the Kentucky Statutes requiring the authority of an agent to bind another as surety, to be in writing and signed by the principal, and the decisions thereunder, as sustaining, in principle at least, the judgment of the circuit court. But, as we have seen, there being no agency here those decisions are not applicable.

Neither are we impressed by the substance of the argument that since the appellant inquired if the Webster County Bank would pay Townsend's checks "up to two thousand dollars," and having agreed to pay Townsend's check "for two thousand dollars," the check presented for $1,957.50, was either a different check from the one accepted, or if the same, there was a material alteration of the sum payable, so as to avoid the acceptance. The effect of the telegraphic correspondence was that the Selma Savings Bank would present a check possibly for as much as $2,000.00 but not for more than that amount, and that the Webster County Bank would pay the check, for whatever sum it might be drawn provided it did not exceed $2,000.00.

In First Natl. Bank of Dunn v. First Natl. Bank of Massillon, 210 Fed. 542, the inquiry was:

"Will you pay Werner Company checks fifty-nine hundred odd dollars? Answer. First National Bank."

The answer read as follows:

"Answering yours. Forward your checks, they will undoubtedly be taken care of by the company when presented."

The check was drawn for $5,921.00.

In answer to the contention that the answer did not constitute an acceptance for $5,921.00, the court said:

"The question formulated in plaintiff's telegram called for a plain, simple answer. All the defendant had to do was to make such an answer. It had it in its power, and it was its duty in fair dealing, to put the question

beyond all possibility of doubt. Being presumed to know this, the defendant wired, 'Forward your checks.' Whatever the telegram said in reference to the solvency of the company was not in direct answer to the telegram, as the telegram inquired whether or not the checks would be paid, not whether or not the Werner Company was solvent.''

See also Bank v. Garrettson, 47 Fed. 869, 51 Fed. 168; Scudder v. Union Nat'l Bank, 91 U. S. 406; Henrietta Nat'l Bank v. State Nat'l Bank, 80 Tex. 648, 26 Am. St. Rep. 773; Elliott v. First National Bank (Tex.), 152 S. W. 808.

The judgment in each case is reversed with instructions to overrule the demurrer to the petition and for further proceedings not inconsistent with this opinion. The whole court sitting.